EARL W. FUGATE and FAYE FUGATE, and EARL W. FUGATE, Transferee, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fugate v. Commissioner
Docket No. 8703-74.
United States Tax Court
T.C. Memo 1977-18; 1977 Tax Ct. Memo LEXIS 423; 36 T.C.M. (CCH) 85; T.C.M. (RIA) 770018; January 27, 1977, Filed *423 Held, withdrawals made by P were corporate distributions and not bona fide loans; held, further, P is a transferee of Air Charters, Inc., and is liable under State law for such corporation's income tax deficiencies to the extent of the property he received. William S. Wood, for the petitioners. Michael W. Ford and Scott R. Cox, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies *424 in the income taxes of the petitioners, Earl W. Fugate and Faye Fugate: Year
Deficiency
1968
$38,060.25
1969
161.00
1971
17,383.97
1972
2,903.00 The Commissioner also determined that the petitioner, Earl W. Fugate, was liable as a transferee for the following deficiencies in the corporate income taxes of Air Charters, Inc.: FYE
Deficiency
May 31, 1967
$ 1,243.00
May 31, 1968
550.00
May 31, 1969
7,355.00
May 31, 1970
912.00 The issues for decision are: (1) Whether withdrawals made by the petitioner from Air Charters, Inc., were bona fide loans or corporate distributions; (2) whether Air Charters, Inc., was entitled to a bad debt deduction for its taxable year ending May 31, 1971; and (3) whether the petitioner, Earl W. Fugate, is liable as a transferee for any part of the income tax deficiencies of Air Charters, Inc.
FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Earl W. Fugate and Faye Fugate, husband and wife, maintained their legal residence in Janesville, Wis., when they filed the petition herein. They filed their joint Federal income tax returns for the years 1968 *425 through 1972 with the Internal Revenue Service Center, Kansas City, Mo. Earl W. Fugate will sometimes be referred to as the petitioner. The petitioner controlled various corporations which either engaged in the hauling of freight by air or provided facilities and services necessary for such business. Midwest Aviation, Inc. (Midwest), formed in 1966, was actually engaged in the hauling of freight by air and was the pivotal corporation upon which all of the other corporations depended. It made its headquarters in Janesville, Wis., the location of its primary customer, a division of General Motors Corporation (GM). Air Charters, Inc. (Air Charters), a Michigan corporation, provided loading and unloading services for Midwest at the Flint, Mich., airport. Such services were extremely important for Midwest because many of GM's fabricators, in addition to large parts warehouses, were located near such airport. During the years in issue, the petitioner was president of Air Charters and owned 60 percent of its stock. The remaining 40 percent was owned equally by his two brothers. Another of the petitioner's corporations, Aero-Services, Inc., purchased airplanes and leased them to *426 Midwest, and Manufacturer's Air Transport Services, Inc., provided air transport for the Peoria, Ill., area. Although Midwest started in 1966 with only one airplane, soon it was in need of more planes and other equipment because GM was satisfied with its services and gave it additional business. As a consequence, throughout the period 1966 through 1969, Midwest and the other corporations economically related to it continued to expand. The financing for such expansion came, in large part, from the petitioner personally borrowing funds for the corporation or by his guaranteeing the indebtedness of the corporation. On October 18, 1968, Air Charters sold an airplane and received $30,000 for it. The petitioner withdrew such funds and used them to make a payment on his personal note which he owed the First National Bank of Janesville. During the next 2 months, Air Charters transferred additional funds totaling $15,000 to the petitioner or on his behalf. In connection with each withdrawal by the petitioner, he executed a promissory note which provided for interest at the rate of 7-1/2 percent per annum. The notes did not provide for a fixed maturity date; rather, they were payable *427 on demand. No collateral was provided for such withdrawals, and no repayment plan was specified in the notes or otherwise. The petitioner has never paid interest on any of these notes, nor has he ever repaid any of these withdrawals. On its Federal corporation income tax returns and its books and records, Air Charters treated such advances as loans. At the time the petitioner made such withdrawals, he was solvent. Air Charters needed a loading ramp, and the petitioner borrowed some funds early in 1969 and purchased such a ramp for approximately $4,000. He turned the ramp over to Air Charters and, in return, received a $4,000 note. In late May 1970, the ramp was repossessed, and the petitioner then executed a promissory note to Air Charters in the amount of $3,468. The petitioner prepared a statement of his financial condition as of March 1969 for the purpose of supporting the value of guarantees he made to various banks where his companies sought credit. The petitioner testified that such statement represented an accurate description of his financial condition as of that date. Such statement did not show the petitioner as indebted to Air Charters for the withdrawals he *428 made less than 6 months previously. However, such statement listed Air Charters as owing the petitioner a $2,500 note and $300 in rents. In late 1969, Midwest suffered a rapid decline in its business affairs as a result of reverses in the automobile industry, and shortly thereafter, loans were called which it could not pay. The collapse of Midwest also caused the demise of Air Charters because it was without an air carrier to provide it with any business. The petitioner testified that as a consequence of the economic decline of his corporations and the additional financial burdens which were placed on him because of his personal guarantees, he became insolvent and thus was never able to repay the amounts he had withdrawn from Air Charters. Air Charters wrote off the withdrawals as wholly worthless bad debts in its 1971 taxable year and, as a consequence, deducted $44,468 on its return for such year. Such deduction resulted in a net operating loss, which was carried back to the years 1968, 1969, and 1970, and refund claims were filed with its return for its 1971 taxable year. In addition, the carryback of losses made available an unused investment credit, which was carried back *429 to 1967. As of May 31, 1971, Air Charters had ceased business, and it listed no assets on its Federal income tax return for the period ending on that date. Subsequently, it received Federal income tax refunds totaling $5,954.31, which were transferred to the petitioner for no consideration. In his notice of deficiency, the Commissioner determined that the petitioner received, in 1968, a distribution from Air Charters in the amount of $45,000. Alternatively, the Commissioner determined that the petitioner received, in 1971, cancellation of indebtedness income of $44,468, or a liquidating dividend in that amount. In the notice of liability issued to the petitioner as transferee of Air Charters, the Commissioner determined that such corporation was not entitled to a bad debt deduction for the petitioner's withdrawals, and that deficiencies resulted for all of the years affected by the loss carrybacks. OPINION The first issue we must decide is whether the withdrawals made by the petitioner from Air Charters were bona fide loans or corporate distributions within the meaning of section 301 of the Internal Revenue Code of 1954. [1] *430 The question of whether shareholder withdrawals are bona fide loans is a factual one which requires consideration and evaluation of the surrounding circumstances. Alterman Foods, Inc. v. United States,505 F. 2d 873, 875-876 (5th Cir. 1974); Berthold v. Commissioner,404 F. 2d 119, 121 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Chism's Estate v. Commissioner,322 F. 2d 956, 960 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Jacob M. Kaplan,43 T.C. 580, 595 (1965). In making such examination, it is of controlling significance to inquire whether the parties intended to create bona fide indebtedness which the shareholder intended to repay and which the corporation intended to collect. Chism's Estate v. Commissioner,supra at 960; Electric & Neon, Inc.,56 T.C. 1324, 1338-1339 (1971), affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Jack Haber,52 T.C. 255, 266 (1969), affd. per curiam 422 F. 2d 198 (5th Cir. 1970); Elliott J. Roschuni,29 T.C. 1193, 1201-1202 (1958), *431 affd. per curiam 271 F. 2d 267 (5th Cir. 1959), cert. denied 362 U.S. 988 (1960). In discerning the parties' intention, the courts have relied upon objective indicia, particularly when, as here, the withdrawals are made by a dominant shareholder. Alterman Foods, Inc. v. United States,supra at 877; Berthold v. Commissioner,supra at 122; Electric & Neon, Inc.,supra at 1339. Consequently, declarations made by the parties that a loan was intended are not controlling. Alterman Foods,Inc. v. United States,supra at 876-877; Berthold v. Commissioner,supra at 122; Ben R. Meyer,45 B.T.A. 228, 240-241 (1941). It is helpful to inquire whether evidences of indebtedness were executed, whether security was given for the withdrawals, and whether interest was paid. Walter K. Dean,57 T.C. 32, 45 (1971); Jack Haber,supra at 266; Elliott J. Roschuni,supra at 1202. The courts have also considered whether the indebtedness was due by a date certain and the amount of repayments made. Alterman Foods, Inc. v. United States,supra at 878; *432 Berthold v. Commissioner,supra at 122; William C. Baird,25 T.C. 387, 395 (1955). However, it must be kept in mind that the presence or absence of any of these indicia is not determinative; they are just helpful guideposts for the trier of fact who must determine, based upon all of the evidence, the crucial fact of whether repayment was actually intended. After a careful consideration and evaluation of all of the facts and circumstances of this case, we hold that the withdrawals in question were not bona fide loans but were corporate distributions. In this case, no collateral was given for the withdrawals, no fixed maturity date was specified, no interest was ever paid, no payment schedule was ever established, no payments were ever made, and no evidence was presented to show that Air Charters ever sought the repayment of such withdrawals. Such facts tend to show that bona fide indebtedness was not intended. Such conclusion is clearly and decisively demonstrated when we consider the way the petitioner treated withdrawals from Air Charters in his dealings with *433 unrelated third parties. Such transactions, conducted at arm's length, are free from the suspicions which inhere in dealings between a shareholder and his controlled corporation and provide an excellent objective view of his actual intent with respect to such withdrawals. In a financial statement setting forth the petitioner's assets and liabilities as of March 31, 1969, less than 6 months after he made the withdrawals, he madeno mention of any liability to Air Charters, although he did represent that such corporation owed him $2,800. The fact that he mentioned the liability of Air Charters to him shows that he did not simply forget Air Charters and his dealings with it. His complete disregard of any liability to Air Charters in representations to unrelated third parties clearly demonstrates that he felt he could ignore them and provides very convincing objective evidence that he did not intend to create bona fide indebtedness. The petitioner makes several arguments in support of his contention that the withdrawals were loans. First, he asserts that he made a $4,000 repayment by his transfer to Air Charters of a loading ramp. We reject this argument for a number of reasons. First *434 of all, the transfer of the ramp was not treated as a repayment by the petitioner and Air Charters or a reduction in the amount he owed the corporation; instead, it was treated as creating a liability of $4,000 on the part of such corporation. In addition, after the ramp was repossessed, the petitioner executed a note for almost $3,500. Thus, when the transaction was completed, Air Charters was without the ramp and indebted to him for an amount in excess of $500 because of it. Such circumstances surely do not demonstrate that the petitioner intended bona fide loans when he made the withdrawals. Next, the petitioner argues that both he and Air Charters strictly adhered to all the formalities of treating the withdrawals as loans to him, but when, as here, the borrowing shareholder controls the lending corporation, such evidence bears little weight. Alterman Foods, Inc. v. United States,505 F. 2d at 878; Elliott J. Roschuni,29 T.C. at 1203; William C. Baird,25 T.C. at 395; W. T. Wilson,10 T.C. 251, 256 (1948), affd. sub nom. Wilson Bros. & Co. v. Commissioner,170 F. 2d 423 (9th Cir. 1948), *435 cert. denied 336 U.S. 909 (1949). The petitioner also argues that because the other shareholders of Air Charters did not receive any funds, the withdrawals by the petitioner cannot be found to be corporate distributions to him. Such argument is without merit since a corporate distribution need not be pro rata. See Elliott J. Roschuni,29 T.C. at 1204. Such argument is not persuasive under the particular circumstances of this case where the stockholder receiving distributions controls the corporation and supplies the financing for it. Nor are we convinced by the petitioner's claim that such funds would not have been distributed to him because they were needed to construct a building. There is no evidence of record to suggest that Air Charters ever sought repayment of the funds for any such purpose. Thus, we conclude that the withdrawals by the petitioner were corporate distributions to him and not bona fide loans. In light of our resolution of this issue, we need not address various alternative positions advanced by the Commissioner. Since we have concluded that the withdrawals by the petitioner were not bona fide loans, it follows that such *436 corporation is not entitled to a bad debt deduction for them.Thus, Air Charters is liable for the deficiencies arising from the disallowance of such deduction. The last issue we must decide is whether the petitioner is liable, as a transferee of property from Air Charters, for any part of such corporation's Federal income tax deficiencies. Section 6901(a) provides the Commissioner with a summary remedy for the collection of a transferee's liability, determined under State law, for the Federal income tax deficiencies of his transferor. Commissioner v. Stern,357 U.S. 39, 42-45 (1958); James K. Pierce,61 T.C. 424, 432 (1974); Helen R. Albert,56 T.C. 447, 449 (1971). Prior to the enactment of the predecessor of section 6901(a), the Commissioner was required to bring a bill in equity or institute an action at law to enforce a transferee's liability, but the use of such procedures was subject to various State statutes or legal doctrines applicable to all private creditors. Commissioner v. Stern,supra at 43. In order *437 to simplify the procedure by which the Commissioner could enforce a transferee's liability for the taxes of his transferor, the predecessor of section 6901(a) was enacted. Id.The Commissioner has the burden of proving all the elements necessary to establish the petitioner's liability as transferee (sec. 6902(a)), and we hold that he has met his burden of proving the petitioner's liability as transferee. In this case, it is undisputed that the petitioner received, for no consideration, $5,954.31 from Air Charters in the form of Federal tax refunds. Such transfer was made by Air Charters after the close of its 1971 taxable year, at which time it had no other assets, although its contingent liability for Federal income taxes was already in existence. Under the Wisconsin Uniform Fraudulent Conveyance Act, a transfer, such as the one herein, which renders the transferor insolvent and is made for no consideration, is fraudulent as to creditors without regard to the transferor's intent. Wis. Stat. *438 Ann. sec. 242.04 (1957). The transferee is liable to a creditor of the transferor to the extent of the property received. Wis. Stat. Ann. sec. 242.09; see also Bruce Dillman,64 T.C. 797, 805-806 (1975). Thus, the petitioner is liable for Air Charters' deficiencies, to the extent of $5,954.31, the amount of income tax refunds, [2] together with interest thereon as provided by law. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. Since we have accepted the Commissioner's position that the withdrawals by the petitioner from Air Charters were not bona fide loans, it follows that the receipt by the petitioner of such notes does not constitute an additional transfer of property by such corporation. Moreover, the Commissioner does not contend that the petitioner received any other property from Air Charters.↩